THE STATE EX REL. CHARLES G. HARVEY v. JOHN G. LINVILLE ET AL., Judges of County Court of Benton County.—300 S. W. 1066.

Division Two, December 12, 1927.

*Paul Barnett* for relator.

*F. M. Brady* for respondents.

WHITE, J.—This is an original proceeding wherein the relator seeks to have this court, by writ of mandamus, compel the judges of the County Court of Benton County to pay him a balance which he claims to be due on his salary as County Superintendent of Public Schools.

The alternative writ was issued on relator's petition, to which respondent's filed their return. Thereupon relator filed a motion for judgment on the pleadings, thereby admitting all facts well pleaded in the return. A former opinion directed a peremptory writ. A motion for rehearing was sustained, and the case argued and submitted a second time.

The petitioner was elected and qualified as Superintendent of Public Schools of Benton County, April 1, 1919, for a four-year term, which ended the last day of March, 1923. He was paid during that time $1350 per annum, a total of $5400, and claims a balance due him of $1050. His salary during the term was dependent upon the population of the county, determined by the vote of the county at the different elections held before and during the term. He claims that the population of the county should be estimated under the provisions of Section 11352, and Section 11354, Revised Statutes 1919. Section 11352 is an amendment of Section 10938, Revised Statutes 1909, which respondents contend is applicable to the case for the reason that the amendment to Section 11352, and Section 11354, did not go into force and effect until after the petitioner was elected and qualified, and therefore do not apply to his case; that said Section 10938, and Section 10719, Revised Statutes 1909 (which is Sec. 11016, R. S. 1919), apply in determining the population of Benton County and petitioner's salary and, if so, the respondent has received more than the salary allowed him by law.

I. The increase of salary which a statute permits after an election showing an increase of population is not in violation of the Constitution in that the salary is increased during the term for which the officer was elected, because the law in force at the time of his election fixes his salary, to be ascertained at periods as changed by the increase in population. [State ex rel. v. Hamilton, 260 S. W. 466.] The salary of an officer, dependent upon the population as ascertained from time to time, would be determined by the law in force at the time of his election, and a law which went into effect later would not affect the matter. Therefore, if the Act of 1919 was not in effect when relator was elected, it would not apply to his salary at any period of his term.

Section 10938, Revised Statutes 1909, provides for ascertaining the "annual" salary. Section 11352, Revised Statutes 1919, says that the superintendent shall receive so much money, dependent upon the population of the county, without saying whether it was per annum. From the context it must be presumed that annual salary was meant. "Annual salary" as used in said Section 10938, means salary for each year of the incumbency. It cannot be split up into periods by elections which occur during the year, and must be calculated on a year as a whole. We conclude further that "annual" as applied to salaries means not the calendar years, but the years of the incumbent's term, which in the case of relator begins on the first day of April each year.

Under Section 11354, enacted in 1919, the relator's salary would be determined by the vote cast at the last *Presidential* election, which was in 1916. The vote for that year was 3183, which multiplied by five would give a population of 15,915. At the presidential election of 1920, the vote was 4915, which multiplied by five would give a population of 24,575. By the provisions of Section 11352, the Superintendent of Schools received a salary, in counties having a population of 15,000 and less than 18,000, of $1350 per annum; and in counties of 24,000 and less than 27,000, a salary of $1800 per annum. Thus, if the annual salary means salary for the unbroken year he should have received $2700 for the first two years, and $3600 for the second two years; a total of $6300. He received $1350 annually for the entire four years, or $5400; leaving a balance due of $900.

The relator, however, figuring that "annual salary" means *at the rate of a certain sum* per year, claims that it would be determined by the months during which the population determining his salary continued until changed by another election, and thereby figures that the amount due the relator would be $1012.50. But conceding also that Section 10719, Revised Statutes 1909, now Section 11016, Revised Statutes 1919, might be in effect, which provides for ascertaining the population from the vote at the *general* election instead of the Presidential election, there would be due only the sum of $675.

In the view we take of the case it is unnecessary to go into the calculations.

If the respondent is correct, Section 10938, Revised Statutes 1909, was in force when he was elected and qualified, and Section 11016 providing for ascertaining the population by the vote at the last general election applies. It provides that the population shall be determined by the vote at the last *general* election. The last general election prior to the election of the relator was in November, 1918, when the vote was 2646. That multiplied by five gives the population at 13,230. At the next general election for 1920, the vote was 4915, which gives a population of 24,575; and at the last general elec-

tion, 1922, the vote was 3785, which, multiplied by five, would give 18,925. Under Section 10938, Revised Statutes 1909, the salaries for superintendents in counties having population of more than 12,000 and less than 15,000, was $800 per year. In counties of 24,000 and less than 27,000, it was $1200 per year; in counties of 18,000 and less than 21,000, the salary was $1000.

If the salary of the superintendent is determined by the unbroken years, for his first two years it would be $1600, and for the next two years $2400, a total of $4000 for the term. If, however, it were figured at the rate of so much per annum, so that a change took effect the first month after election, it would be for the first year and eight months, to December 1, 1920, $1333.33; for the next two years $2400, and for the remaining four months it would be at $1000 per year, $333.33, making $4066.66.

By either method of figuring the relator received more than was due him for the four years.

II. The question of the petitioner's right to a peremptory writ in this case turns entirely upon whether the Act of 1919, now embodied in Sections 11352 and 11354 of the Revised Statutes of that year, were in effect before or after he was elected and qualified. The Act was approved March 28, 1919, three days before he was elected and qualified. He claims that it went into effect at once because it contained an emergency clause. Respondents assert that it was not a measure to which the emergency provisions of the Constitution would apply. The emergency clause of the Act of 1919, is as follows:

"Sec. 4. *Emergency Clause.* The fact that the annual school election will be held on the first Tuesday in April, 1919, at which time county superintendents of public schools for the several counties, in this State will be elected, creates an emergency within the meaning of the Constitution; therefore this Act shall take effect and be in force from and after its passage."

Two sections of the Constitution apply to the taking effect of the law, and the effectiveness of an emergency clause. Section 36, Article IV, of the Constitution is as follows:

"Sec. 36. *Laws take effect.* No law passed by the General Assembly, except the general appropriation act, shall take effect or go into force until ninety days after the adjournment of the session at which it was enacted, unless in case of an emergency (which emergency must be expressed in the preamble or in the body of the act), the General Assembly shall, by a vote of two-thirds of all the members elected to each house, otherwise direct; said vote to be taken by yeas and nays, and entered upon the journal."

That portion of Section 57, Article IV, of the Constitution which was later adopted in connection with the referendum, contains this clause applicable to this case:

"The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety and laws making appropriations for the current expenses of the state government, for the maintenance of the state institutions *and for the support* of public schools), either by the petitions signed," etc.

It was held in the case of State v. Sullivan, 283 Mo. 546, that these two sections of the Constitution must be construed together; that a declaration in a bill that it was an emergency measure within the meaning of the Constitution, did not make it so; that the emergency must appear in fact upon the face of the bill to be within the terms of the Constitution, authorizing an emergency clause which would put the act into immediate effect.

The respondent claims the Act of 1919 did not go into effect for ninety days under Section 36, Article IV, because it was one subject to the referendum, under the exception mentioned in Section 57 of that Article:

"Except as to laws necessary for the immediate preservation of the public peace, health or safety and laws making appropriations for the current expenses of the state government, for the maintenance of the state institutions, and for the support of the public schools."

Plainly the emergency clause in the act does not state a condition to which the emergency provision of the Constitution could apply.

It was held in the Sullivan case that any act to which the referendum might apply could not be an emergency measure; that by the operation of Section 36, Article IV, the act would not go into effect until ninety days, if it was one to which, under Section 57 of the Article, the referendum applied. It is evident that the provision relating to laws making appropriations for the current expenses of the State Government, for the maintenance of state institutions, and for the support of public schools means that the word "appropriations" applies to each of those conditions. That is, it must be an act making *appropriations* for the support of public schools, which are excluded from the referendum, not merely any act which tends to support public schools. It evidently contemplates such provisions as appear in the appropriations bills, for the support and operation of the state teachers' colleges, the State University, teachers' training schools in certain cities, and inspectors of public schools, the State Educational Department; which are maintained by direct appropriations of money by the Legislature in their appropriation bills.

The relator very ingeniously argues that appropriations may be general as well as special; that a general law by the Legislature which authorizes the county court of a county to pay money for certain purposes is in a broad sense an appropriation. [State ex rel. v. Mason, 153 Mo. 1. c. 59.] He argues further that if the emergency provision in the Constitution was not given that meaning the public schools might be closed for lack of such appropriations.

There is no ground for such apprehension. Whether the county superintendent's salary was determined by one law or another; whether it was large or small; whether the laws of 1909 or the Act of 1919 applied, would make no difference in the operation of the schools in this case, nor can we conceive of a case where it would. Some law is always in force and effect providing for the operation and maintenance of the public schools. It would be a stretch of construction to say that the framers of the referendum clause in the Constitution meant anything else than laws which *directly* set apart certain sums for certain purposes. If ''appropriations'' were used in the broader sense, so as to include laws which authorize the expenditure of money, or laws which fix salaries in connection with public schools and authorize their payment out of county funds, it could have been much more definitely and specifically stated. The evident reason for excluding certain emergency measures from the operation of the referendum does not apply to the Act of 1919, because it was not one upon which the continued functioning of state departments depended.

The word ''appropriations'' could not, by the ordinary use of the term, nor by its apparent significance in the Constitution, have any such general meaning as that contended for, so as to mean any law authorizing any county officials to pay out county money for specific purposes.

Accordingly a peremptory writ is denied, and the proceeding dismissed. All concur.